1  EDMUND G. BROWN JR.
   Attorney General of the State of California
2  DANE R. GILLETTE
   Chief Assistant Attorney General
3  GARY W. SCHONS
   Senior Assistant Attorney General
4  KEVIN VIENNA
   Supervising Deputy Attorney General
5  GARRETT BEAUMONT, State Bar No. 63863
   Deputy Attorney General
6    110 West A Street, Suite 1100
     San Diego, CA 92101
7    P.O. Box 85266
     San Diego, CA 92186-5266
8    Telephone: (619) 645-2277
     Fax: (619) 645-2191
9    Email: Garrett.Beaumont@doj.ca.gov

10 Attorneys for Respondent

11                IN THE UNITED STATES DISTRICT COURT

12                FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **LAMARR RASHID CROWDER,**<br><br>                                Petitioner,<br><br>v.<br><br>**JAMES E. TILTON, Secretary, California Department of Corrections and Rehabilitation,**<br><br>                                Respondent. | 08-0694 DMS (JMA)<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF RESPONDENT'S ANSWER TO PETITION FOR WRIT OF HABEAS CORPUS**<br><br>Judge: Honorable Jan M. Adler |

# TABLE OF CONTENTS

|  | Page |
|---|---|
| STATEMENT OF THE CASE | 1 |
| STATEMENT OF FACTS | 2 |
|     DEFENSE | 6 |
| ARGUMENT | 6 |
| I. THE STATE COURT REJECTION OF PETITIONER'S FEDERAL HABEAS CORPUS CLAIMS DID NOT CONTRADICT OR UNREASONABLY APPLY ESTABLISHED FEDERAL LAW, AS DETERMINED BY THE UNITED STATES SUPREME COURT, AND DID NOT RELY ON UNREASONABLE FACTUAL DETERMINATIONS OF THE STATE COURT EVIDENCE | 6 |
|     A. Petitioner's Federal Habeas Corpus Claim That The State Trial Court Deprived Him of His Federal Constitutional Right to Confront And Cross-examine a Critical Prosecution Witness (Ground One of The Federal Habeas Corpus Petition, Petition 4-5) | 7 |
|     B. Petitioner's Federal Habeas Corpus Claim That the State Prosecution Violated Due Process under *Brady v. Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215(1963) by Suppressing Material Evidence That Would Have Impeached the Informant (Ground Two of the Federal Habeas Petition, Petition 5-6) | 10 |
| CONCLUSION | 13 |

08-0694 DMS (JMA)

# TABLE OF AUTHORITIES

Page

**Cases**

*Banks v. Dretke*
540 U.S. 668
124 S. Ct. 1256
157 L. Ed. 2d 1166 (2004) ............................................................... 10, 11

*Brady v. Maryland*
373 U.S. 83
83 S. Ct. 1194
10 L. Ed. 2d 215 (1963) ................................................................... 10, 11

*Delaware v. Van Arsdall*
475 U.S. 673
106 S. Ct. 1431
89 L. Ed. 2d 674 (1986) ......................................................................... 8

*Early v. Packer*
537 U.S. 3
123 S. Ct. 362
154 L. Ed. 2d 263 (2002) ....................................................................... 7

*In re Wright*
78 Cal. App. 3d 788
144 Cal. Rptr. 535 (1978) ..................................................................... 12

*Kyles v. Whitley*
514 U.S. 419
115 S. Ct. 1555
131 L. Ed. 2d 490 (1995) ............................................................... 10, 11

*Lockyer v. Andrade*
538 U.S. 63
123 S. Ct. 1166
155 L. Ed. 2d 144 (2003) ....................................................................... 7

*People v. Beryea*
38 Cal. App. 3d 176
113 Cal. Rptr. 254 (1974) ..................................................................... 12

*People v. Chatman*
38 Cal. 4th 344
42 Cal. Rptr. 3d 621
133 P.3d 534 (2006) ............................................................................... 8

*People v. Cole*
94 Cal. App. 3d 854
155 Cal. Rptr. 892 (1979) ..................................................................... 12

**TABLE OF AUTHORITIES (continued)**

| | Page |
|---|---|
| *People v. Farmer*<br>47 Cal. 3d 888<br>254 Cal. Rptr. 508<br>765 P.2d 940 (1989) | 12 |
| *People v. Salazar*<br>35 Cal.4th 1031<br>29 Cal. Rptr. 3d 16<br>112 P.3d 14 (2005) | 10, 11 |
| *People v. Wheeler*<br>4 Cal. 4th 284<br>14 Cal. Rptr. 2d 418<br>841 P.2d 938 (1992) | 8 |
| *Price v. Vincent*<br>538 U.S. 634<br>123 S. Ct. 357<br>155 L. Ed. 2d 877 (2003) | 7 |
| *Strickler v. Greene*<br>527 U.S. 263<br>119 S. Ct. 1936 (1999) | 10, 11 |
| *U.S. v. Bagley*<br>473 U.S. 667<br>105 S. Ct. 3375<br>87 L. Ed. 2d 481 (1985) | 10, 11 |
| *Woodford v. Viscotti*<br>537 U.S. 19<br>123 S. Ct. 357<br>154 L. Ed. 2d 279 (2002) | 7 |

**TABLE OF AUTHORITIES** (continued)

Page

**Statutes**

28 United States Code
    § 2254 (d) ..... 7

California Evidence Code
    § 352 ..... 8, 9

California Penal Code
    § 187 (a) ..... 1
    § 246 ..... 1
    § 266i ..... 7
    § 286 (b)(2) ..... 8
    § 288a (a)(2) ..... 8
    § 654 ..... 2
    § 1181[8] ..... 10
    § 12022.5 ..... 1
    § 12022.53 (d) ..... 2

**Other Authorities**

CALJIC No.
    2.23 ..... 9

08-0694 DMS (JMA)

iv

1  EDMUND G. BROWN JR.
   Attorney General of the State of California
2  DANE R. GILLETTE
   Chief Assistant Attorney General
3  GARY W. SCHONS
   Senior Assistant Attorney General
4  KEVIN VIENNA
   Supervising Deputy Attorney General
5  GARRETT BEAUMONT, State Bar No. 63863
   Deputy Attorney General
6    110 West A Street, Suite 1100
     San Diego, CA 92101
7    P.O. Box 85266
     San Diego, CA 92186-5266
8    Telephone: (619) 645-2277
     Fax: (619) 645-2191
9    Email: Garrett.Beaumont@doj.ca.gov

10 Attorneys for Respondent

11                IN THE UNITED STATES DISTRICT COURT

12              FOR THE SOUTHERN DISTRICT OF CALIFORNIA

13

| | |
|---|---|
| 14  **LAMARR RASHID CROWDER,** | 08-0694 DMS (JMA) |
| 15                     Petitioner, | MEMORANDUM OF POINTS AND AUTHORITIES IN |
| 16  v. | SUPPORT OF RESPONDENT'S ANSWER TO PETITION FOR |
| 17  JAMES E. TILTON, Secretary, California Department of Corrections and Rehabilitation, | WRIT OF HABEAS CORPUS |
| 18                     Respondent. | Judge: Honorable Jan M. Adler |

20                        **STATEMENT OF THE CASE**

21          An amended information filed in San Diego County Superior Court charged

22  Petitioner with murder (California Penal Code § 187 (a), count one) and shooting into an inhabited

23  vehicle (California Penal Code § 246, count two). The information specially alleged Petitioner

24  personally used a firearm (California Penal Code § 12022.5, counts one and two) and discharged a

25  firearm causing death (California Penal Code § 12022.53 (d), counts one and two). (Lodgment 1:

26  1 CT 3-4.)

27          A jury found Petitioner guilty of the charges, found the murder was first degree murder,

28  and found true the special allegations. (1 CT 201-4.)

1   On April 29, 2005, the state trial court sentenced Petitioner to state prison for fifty years to life, comprised of the twenty-five years to life term for count one plus a consecutive twenty-five years to life term for the California Penal Code section 12022.53 (d), enhancement for that count. The state trial court stayed sentences on remaining the count and enhancements (California Penal Code § 654). (2 CT 271.)

The California Court of Appeal affirmed the judgment on September 18, 2006. (Lodgment 3.) The California Supreme Court denied review on January 17, 2007. (Lodgment 6.)

**STATEMENT OF FACTS**

Petitioner dated Julia Aldana. (Lodgment 2: 2 RT 141-6, 3 RT 355-6, 358-9, 4 RT 460, 477; 1 CT 41.) After they got engaged (2 RT 141, 143), she followed Petitioner to Portland, Oregon. (2 RT 128, 143, 3 RT 363-4, 4 RT 460-1; 1 CT 44.) A few months later she decided to leave Petitioner and move back to San Diego. (2 RT 149-52; 1 CT 46.) Julia began dating victim Jaime Garcia after she moved back to San Diego. (2 RT 128, 153-4, 3 RT 356-7; 1 CT 56, 58.) He proved to be a better provider than Petitioner. (2 RT 151-2, 156, 219.) Soon they were engaged. (2 RT 128-9, 146, 154-6, 3 RT 365, 385; 1 CT 61, 63.)

Meanwhile Petitioner returned to San Diego. (2 RT 157.) Julia ran into Petitioner at a Target store. (2 RT 157, 336; 1 CT 65.) Petitioner learned Julia and Garcia were engaged. (2 RT 160-1, 342.) Julia told Garcia she saw Petitioner. (1 CT 76.)

Julia visited Petitioner at Petitioner's parents' house and talked with Petitioner over the phone. (2 RT 162-5, 171, 173-4, 188-91, 4 RT 461-2, 478-80, 5 RT 676; 1 CT 66-75, 78-80.) Julia told Petitioner about a Lincoln Navigator Garcia helped purchase. (2 RT 164, 199, 303; 1 CT 71.) Julia told Petitioner her parents wanted her to stay away from Garcia because of their fights. (2 RT 167.) Julia said she and Garcia might want to take a break from each other. (2 RT 254, 257.) Petitioner wanted get back together with Julia. (2 RT 164-7, 177-8, ; 1 CT 72.)

Petitioner phoned Julia asking to have sex with her. (2 RT 170; 1 CT 75.) She refused. (2 RT 170, 255, 257.) Julia reminded Petitioner she was still with Garcia even though she did not know what would happen between them. (1 RT 172.) Petitioner told her to stop playing with his feelings. (2 RT 171-2; 1 CT 79.)

1    Petitioner once threatened to shoot any new boyfriend who took Julia away from him.
2  (3 RT 335.) Julia recalled seeing Petitioner with a semi-automatic handgun before they moved to
3  Oregon. (2 RT 218; 1 CT 59-61.) Petitioner threatened to hurt Garcia after learning Julia was dating
4  Garcia. (2 RT 219, 337.) Petitioner said he dreamed Garcia had been plotting to break them up ever
5  since they were in Portland. (1 CT 82-4.) Petitioner wanted to hurt Garcia because Garcia took Julia
6  away from him. (2 RT 303-5.) During one telephone conversation, Petitioner told Julia he was
7  looking for Garcia around her neighborhood so Julia could watch him beat Garcia. (2 RT 218-9,
8  304, 337, 340, 3 RT 399; 1 CT 102, 104.)
9    After returning to her parents' house from Petitioner's parents' house at 1 a.m., Julia saw
10 Garcia parked outside in his Lincoln Navigator. (2 RT 326; 1 CT 80.) They talked until 2:30 a.m.
11 (1 CT 80.) Julia told Petitioner Garcia waited for her in front of her house in the Lincoln Navigator.
12 (2 RT 326.)
13    During an argument with Garcia, Julia told Garcia she was still seeing Petitioner. (2 RT
14 179.) When Julia told Garcia she was still seeing Petitioner, (2 RT 178; 1 CT 81), Garcia got upset
15 (2 RT 179; 1 CT 82). Garcia said Petitioner should watch his back. (2 RT 179, 306, 3 RT 398.)
16 Garcia vowed he would hurt Petitioner if Julia left Garcia for Petitioner. (1 CT 101.) Garcia said
17 he would shoot Petitioner, then himself. (1 CT 101.)
18    Julia and Garcia went to dinner and a movie the evening of June 23, 2003. (2 RT 130-2,
19 181-2.) During the drive home Julia answered Petitioner's cell phone call in Spanish, so Garcia
20 would think she was talking to her mother. (2 RT 184-5, 266; 1 CT 87-8.) When she finally told
21 Garcia she was speaking to Petitioner (2 RT 185, 270), Garcia demanded she give him the phone.
22 (2 RT 132; 1 CT 89.) She refused. (1 CT 89.) Garcia dropped her off at her parents' house, then
23 left. (2 RT 133, 338; 1 CT 90.)
24    Petitioner left several phone messages with Julia while she was out with Garcia. (2 RT
25 182.) Julia juggled phone conversations between Petitioner and Garcia after Garcia returned home
26 (July 23-4, 2003). (2 RT 133-4, 193-5, 308-10, 319-23, 330-2, 3 RT 397, 412, 4 RT 442-4, 486, 5
27 RT 678-9, 6 RT 722-3, 7 RT 904; 1 CT 90-7.) Petitioner returned to his parents' house after
28 ///

completing his work shift at a local gas station at 12:15 a.m. (July 24, 2003). (6 RT 747, 7 RT 902-3.) Garcia drove back to Julia's parents' house about 1:36 a.m. (July 24, 2003). (2 RT 134-5.)

Garcia phoned Julia 2:12 a.m., informing her he was calling from outside her parents' house. (2 RT 199, 201, 208, 320-1, 3 RT 397.) During an ensuing phone conversation Julia told Garcia to go home. (2 RT 201.) Multiple gunshots rang out outside the house. (2 RT 323, 3 RT 365, 386, 398, 5 RT 666, 6 RT 755, 7 RT 889; 1 CT 97.) A car sped away from the scene. (3 RT 366, 368-9, 378, 382, 386, 5 RT 667, 6 RT 755-7, 7 RT 889-92.)

Julia went outside to see what happened. (2 RT 202, 3 RT 367; 1 CT 98.) She found Garcia's lifeless body in the driver's seat of the Lincoln Navigator. (2 RT 280-1, 3 RT 367-8, 387, 4 RT 450, 5 RT 670, 7 RT 902; 1 CT 98.) The killer shot Garcia through the driver's side window while standing within five feet of the Navigator. (3 RT 367, 389, 4 RT 452, 456-7, 5 RT 672, 7 RT 854-61, 869-79.) Julia made a 911 call at 2:32 a.m., minutes after she heard the gunshots. (2 RT 281, 289, 334-5, 378, 381, 386-7.)

Police responded to the shooting scene minutes later. (2 RT 283, 335, 448-51.) Police arrived at Petitioner's parents' home at 4:30 a.m.. (6 RT 736.) They found Petitioner's black 1998 Chevrolet Malibu parked in the driveway (4 RT 465, 510), its hood still warm (6 RT 737-8). Inside the car they found a knit cap wrapped around a .357 handgun (not the murder weapon). (4 RT 512, 5 RT 653-4, 6 RT 844.) They also found glass particles inside the Malibu. (6 RT 790-1.)

They found another knit cap and a mask inside Petitioner's bedroom. (4 RT 513, 658-9.) They found gun cleaning kits in Petitioner's bedroom (5 RT 657) and in the hallway outside Petitioner's bedroom (4 RT 514-6). They found a .380 caliber bullet in a drawer in Petitioner's bedroom. (5 RT 657-8.) They found a loaded 9 mm Ruger in Petitioner's brother's closet. (5 RT 659-60, 62.) While the bullets in the Ruger were similar to shell casings found at the shooting scene (4 RT 451), that weapon did not fire the shells (5 RT 695).

Police found Petitioner's DNA on a pair of black gloves discovered in the trash outside appellant's parents' house (5 RT 654-5, 6 RT 841) and on a pair of black and red gloves found in the rear pocket of Petitioner's brother's pants discovered in the brother's bedroom (5 RT 656, 6 RT 842). More than one person wore the gloves. (6 RT 840-2, 847.) More than one person wore the

08-0694 DMS (JMA)

1  knit cap found in the car. (6 RT 946, 847.) DNA testing of the knit cap found in the Malibu did not
2  exclude Garcia as a DNA contributor. (6 RT 846.)

3  Gunshot residue testing revealed two elements unique to gunshot residue (GSR) on
4  Petitioner's right hand (6 RT 785, 818-20, 829) and one unique element on his left (6 RT 786, 818-
5  20, 829). It revealed two elements unique to GSR on the left black glove found in the trash. (6 RT
6  787.) It revealed two elements unique to GSR on the left red and black glove found in Petitioner's
7  brother's pants pocket (6 RT 788-9) and one element unique to GSR on the right (6 RT 789). A
8  shooter could transfer GSR to his hands when taking off gloves following a shooting. (6 RT 787,
9  822.)

10  Police tests confirmed that when driving the speed limit, one could drive from Petitioner's
11  parents' home to the scene of the shooting in ten minutes, thirty-five seconds, to twelve minutes,
12  fifty-nine seconds, depending on the route one took. (2 RT 133, 4 RT 579, 6 RT 766-73.)

13  During post-arrest conversations with a jailhouse informant, Petitioner made the following
14  statements regarding the murder. Petitioner was in jail for a murder arising from an argument with
15  another man over a woman. (4 RT 532-3.) The other man threatened him over the phone. (4 RT
16  532-3.) Petitioner discovered through a phone conversation with the woman that the man was
17  outside her house. (4 RT 535.) Petitioner "pushed up" (confronted) the other man, then "blasted"
18  him in the head "and everywhere." (4 RT 534.) Although police found bullets, gloves and a .357
19  magnum at his home, they would never find the murder weapon. (4 RT 534-5.)

20  While in jail, Petitioner exchanged letters with Julia. (2 RT 221-4.) In one letter, he said
21  "that shit" happened to Garcia because Garcia plotted against Petitioner. (2 RT 224, 318.)

22  The prosecutor introduced a surveillance audio and video tape depicting Petitioner talking
23  on the phone to an unidentified listener during appellant's July 23-24, 2003, work shift at the local
24  gas station. During the first phone conversation, which took place from 6:41 p.m. to 7 p.m.,
25  Petitioner expressed his anger at a "nigger" who kept phoning every week when Petitioner was (still)
26  with "her", a "nigger" who "was plotting the whole time." (1 CT 112.) Petitioner woke up from last
27  night's dream "[r]eady to whoop his ass[.]" (1 CT 112.)
28  ///

During the second phone conversation, which took place from 11:46 p.m. to 11:54 p.m., Petitioner said "I'm fucking mad now[,]" since the "bitch ain't answering her phone." (1 CT 114.) "Off that nigger blood[,]" Petitioner remarked, after noting ". . . he told her he ain't gonna let her go that easy." (1 CT 114.) Petitioner said he would "[k]idnap both their asses[,]" and would "make her watch." (1 CT 114.) Petitioner explained ". . . why I'm so hot." (1 CT 115.) "[T]he nigger was calling . . . every week." (1 CT 114.) "She's with this nigger. He's been plotting this the whole time." (CT 115.) Petitioner "woke up madder than a mother fucker[] [c]ause I had a dream about this shit." (1 CT 115.)

**DEFENSE**

The Malibu found in Petitioner's driveway did not resemble or sound like the car driven away from the shooting scene. (8 RT 982-8, 1002-11.) Although one eyewitness recalled the car's glaring headlights as it sped away from the shooting scene (6 RT 756), Julia's mother acknowledged she may have told a police officer the car she saw had its headlights turned off. (3 RT 382.) The Malibu found in Petitioner's parents' driveway had headlights which turn on automatically when the car is driven at night. (8 RT 991.) There were no signs anyone tampered with those headlights. (8 RT 991, 993.)

The majority of particles taken from the gloves and Petitioner's hands were not GSR. (8 RT 1013-6.) GSR on the right hand of two pairs of gloves suggested contamination from multiple shots fired by a right handed person. (8 RT 1022.) GSR contamination likely occurred during Petitioner's transportation in a police car. (8 RT 1021-2.)

**ARGUMENT**

**I.**

**THE STATE COURT REJECTION OF PETITIONER'S FEDERAL HABEAS CORPUS CLAIMS DID NOT CONTRADICT OR UNREASONABLY APPLY ESTABLISHED FEDERAL LAW, AS DETERMINED BY THE UNITED STATES SUPREME COURT, AND DID NOT RELY ON UNREASONABLE FACTUAL DETERMINATIONS OF THE STATE COURT EVIDENCE**

Federal habeas corpus petitioners cannot get any federal habeas corpus relief if the state court rejection of their federal habeas corpus claims did not contradict or unreasonably apply

08-0694 DMS (JMA)

6

established federal law as determined by the United States Supreme Court, and did not rely on unreasonable factual determinations of the state court evidence. 28 U.S.C. § 2254 (d); *Price v. Vincent*, 538 U.S. 634, 123 S. Ct. 357, 155 L. Ed. 2d 877 (2003); *Lockyer v. Andrade*, 538 U.S. 63, 71, 123 S. Ct. 1166, 155 L. Ed. 2d 144 (2003); *Early v. Packer*, 537 U.S. 3, 7, 123 S. Ct. 362, 154 L. Ed. 2d 263 (2002); *Woodford v. Viscotti*, 537 U.S. 19, 24, 123 S. Ct. 357, 154 L. Ed. 2d 279 (2002). Petitioner is not entitled to any federal habeas corpus relief because the California Court of Appeal and the California Supreme Court did not contradict or unreasonably apply established federal law as determined by the United States Supreme Court, and did not rely on unreasonable factual determinations of the state court evidence, when denying Petitioner's federal habeas corpus claims on the merits. (Lodgments 6 and 8.) Respondent separately discusses Petitioner's federal habeas corpus claims below.

**A.  Petitioner's Federal Habeas Corpus Claim That The State Trial Court Deprived Him of His Federal Constitutional Right to Confront And Cross-examine a Critical Prosecution Witness (Ground One of The Federal Habeas Corpus Petition, Petition 4-5)**

Petitioner repeats his unsuccessful state appellate court claim that the state trial court violated his federal constitutional right to confront and cross-examine a critical prosecution witness by erroneously denying his motion to impeach the jailhouse informant with dismissed sex charges previously filed against the informant, charges dismissed in 1997 in exchange for the informant's guilty plea to a charge of pandering (California Penal Code § 266i). (1 CT 12, 27-30;1 RT 20-8, 47-8, 4 RT 518-20; lodgment 3 at 19-24; lodgment 7 at 18-21; federal habeas corpus petition ground one, petition 4-5.)

The state courts reasonably rejected the claim. (Lodgment 6 at 7-11; lodgment 8.) Within the confines of the Sixth Amendment's Confrontation Clause, state trial courts retain wide latitude to restrict cross-examination and impeachment that is repetitive, unduly prejudicial, confusing of the issues, or of marginal relevance. A state trial court's discretionary ruling does not violate the Sixth Amendment unless defendant shows the prohibited cross-examination or impeachment would have produced a significantly different impression of the witness's credibility.
/ / /

(Lodgment 6 at 11, fn. 4.) *Delaware v. Van Arsdall*, 475 U.S. 673, 678-680, 106 S. Ct. 1431, 89 L. Ed. 2d 674 (1986), as discussed in *People v. Chatman*, 38 Cal. 4th 344, 372, 42 Cal. Rptr. 3d 621, 133 P.3d 534 (2006).

      The dismissed charges against the informant, which included sodomy with a child under sixteen by a person over twenty-one (California Penal Code § 286 (b)(2)), oral copulation with a child under sixteen by a person over twenty-one (California Penal Code § 288a (a)(2)), and statutory rape (California Penal Code § 261.5), stemmed from the informant's introduction to a fourteen year-old prostitute by her brother, a former cell mate of the informant. (1 RT 14.) The informant's ensuing guilty plea to pandering netted him a five year prison sentence. (1 CT 12, 14, 27; 1 RT 27.) The trial court excluded evidence of the dismissed sex charges under California Evidence Code section 352, notwithstanding Petitioner's argument that since the dismissed sex charges could still be revived, their admission was relevant to assess the informant's credibility as a witness. (1 CT 29-30, 32; 1 RT 26-37, 47-8.)

      The state trial court did not abuse its discretion by excluding the dismissed (and therefore unproven) sex charges under California Evidence Code section 352 (1 RT 20-8, 47-8, 4 RT 518-20) since their alleged probative impeachment value was substantially outweighed by the danger their admission would necessitate undue consumption of time or create substantial danger of undue prejudice, of confusing the issues or of misleading the jury. California Evidence Code section 352; *People v. Wheeler*, 4 Cal. 4th 284, 290, 14 Cal. Rptr. 2d 418, 841 P.2d 938 (1992). *See also*: the state prosecutor's points and authorities (1 CT 12-4) and argument (1 RT 18-9) opposing admission of the dismissed sex charges.

      As the state trial court noted (1 RT 20-2, 27-8), Petitioner had plenty of ammunition to impeach the jailhouse informant without resorting to the dismissed and unproven sex charges. The informant took the witness stand in his jail clothes. (4 RT 528.) During the informant's direct examination, jurors heard he was currently in custody for possessing narcotics for sale. (4 RT 528.) Jurors heard he had prior felony convictions for selling a substance in lieu of a controlled substance ("bunk"), for possessing a controlled substance, for selling narcotics, for battery, and for pandering. (4 RT 528-9, 5 RT 613.) The state trial court instructed jurors they could consider a witness's felony

1 | convictions in assessing his credibility. Former CALJIC No. 2.23. (1 CT 160; 4 RT 530-1, 9 RT 1091.)

Jurors heard the informant got probation for his first felony conviction, got probation and six months jail time for his second conviction, spent sixteen months in prison for his third conviction and spent five years in prison for his fourth conviction, all the foregoing prison time served prior to the current felony for which he was in custody. (4 RT 528-30.) Jurors heard the informant faced misdemeanor theft charges in another previous case. (4 RT 531.) Jurors also heard that after spending fifteen months in custody for his current offense, the informant bargained for a three-year probationary term, and a drug outpatient program, in exchange for his testimony against Petitioner. (4 RT 537.)

Petitioner's state trial counsel revisited the bargain and the informant's criminal history when cross-examining the informant, making the point that the informant knew from his criminal experience that he could avoid a lengthy recidivist prison sentence by testifying against Petitioner. (4 RT 539-40, 542-4, 552-3.) Petitioner's state trial counsel also explored the extra jail benefits the informant received as a pro per litigant in his current case. (4 RT 542.)

As the state trial court additionally observed when it excluded the dismissed sex charges under Evidence Code section 352 (1 RT 22-7), evidence of charges dismissed pursuant to a seven-year old plea bargain risked consuming an undue amount of time, confusing the issues and misleading the jury. Were the dismissed sex charges admitted, the prosecutor could explore such tangential matters as the strength of the evidence behind the dismissed charges, which apparently involved consensual sex with a fourteen-year old prostitute; the circumstances surrounding the plea bargain; whether the dismissed charges could in fact be revived seven years after the plea bargain; and whether the informant would reasonably have considered such a possibility.

In light of the foregoing state trial court record, the state courts reasonably concluded that the state trial court's exclusion of the dismissed 1997 sex charges did not implicate Petitioner's federal constitutional right to confront and cross-examine the informant.

///
///

**B.  Petitioner's Federal Habeas Corpus Claim That the State Prosecution Violated Due Process under *Brady v. Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215(1963) by Suppressing Material Evidence That Would Have Impeached the Informant (Ground Two of the Federal Habeas Petition, Petition 5-6)**

Petitioner repeats his unsuccessful state court appellate claim that the state prosecution violated due process under *Brady v. Maryland*, 373 U.S. 87, by suppressing material evidence that would have impeached the informant. (Ground two of the federal habeas corpus petition, petition 5-6.) To prove that claim, Petitioner had to prove that the state prosecution willfully or inadvertently suppressed favorable impeachment evidence which would have rendered a favorable defense verdict reasonably probable. *Kyles v. Whitley*, 514 U.S. 419, 432-433, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995); *U.S. v. Bagley*, 473 U.S. 667, 682, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985). The state courts reasonably rejected the claim. (Lodgment 6 at 12-19; lodgment 8.)

Petitioner made the claim when unsuccessfully arguing that the state trial court erroneously denied (11 RT 1265-8, 12 RT 1274-8) Petitioner's motion for a new trial (California Penal Code § 1181[8]; 2 CT 235-48) based upon the following allegedly undisclosed, newly-discovered evidence set forth in three declarations procured by Petitioner. In two of the declarations two inmate-declarants who allegedly talked to the informant while they all were in jail declared they heard the informant say he put a story together to help his own case so he could get out of prison. (2 CT 241-6.) In the third declaration, a sheriff's deputy opined the informant's safety concerns were consistent with those of a hypothetical sex offender who feared bodily harm from other inmates. (2 CT 1-3). (Lodgment 3 at 25-34; lodgment 7 at 22-26.)

The state courts reasonably rejected Petitioner's federal habeas corpus claim that the state prosecutor violated due process by willfully or inadvertently suppressing the alleged newly-discovered and previously-undisclosed evidence contained in Petitioner's declarations. (2 CT 235.) Petitioner could not meet his initial burden of proving the prosecution willfully or inadvertently suppressed the alleged newly-discovered evidence. *Brady v. Maryland*, 373 U.S.,87; *Banks v. Dretke*, 540 U.S. 668, 691, 124 S. Ct. 1256, 157 L. Ed. 2d 1166 (2004); *Strickler v. Greene*, 527 U.S. 263, 282, 119 S. Ct. 1936, 144 L. Ed. 2d 286 (1999); *People v. Salazar*, 35 Cal.4th 1031, 1042-1043, 29 Cal. Rptr. 3d 16, 112 P.3d 14 (2005). The state prosecution could not have suppressed

08-0694 DMS (JMA)

1  evidence accessible to Petitioner, i.e., evidence obtained by Petitioner rather than the prosecution.
2  The state prosecution had no due process duty to investigate Petitioner's case for Petitioner in order
3  to obtain evidence discoverable by Petitioner through the exercise of his own reasonable diligence.
4  *Banks v. Dretke*, 540 U.S. 691; *Strickler v. Greene*, 527 U.S. 282; *People v. Salazar*, 35 Cal. 4th,
5  1049.

6  Petitioner could not in any event meet his burden of proving the allegedly suppressed
7  evidence was material, i.e., that different verdicts would be reasonably probable had the allegedly
8  suppressed evidence been admitted at trial. *Brady v. Maryland*, 373 U.S. 87; *Kyles v. Whitley*, 514
9  U.S. 432-433; *U.S. v. Bagley*, 473 U.S. 682; *People v. Salazar*, 35 Cal. 4th 1043. *See also*: the state
10 prosecutor's points and authorities opposing new trial motion. (2 CT 256-61.) Even without the
11 informant's testimony, powerful evidence, including Petitioner's own statements before and after
12 the crime, independently established Petitioner's guilt. *See*: the state prosecutor's points and
13 authorities opposing the new trial motion (2 CT 251-6); and Respondent's statement of the facts,
14 *ante*.

15 Furthermore, the jurors who convicted Petitioner already knew the informant was a repeat
16 felon (4 RT 528-31, 539-40, 5 RT 600-1) who avoided a likely prison sentence (4 RT 535-9, 543-5)
17 by initiating a conversation with Petitioner (4 RT 532, 545-6) and thereafter testifying against
18 Petitioner (4 RT 532-5). They heard the informant gave evidence against Petitioner while seeking
19 leniency on his current case. (4 RT 537, 5 RT 603-6, 611-2.) They heard the informant knew child
20 molesters and rapists faced danger in custody. (5 RT 612-3.) They heard that as a pro per inmate,
21 the informant had unmonitored phone privileges and access to the jail library. (4 RT 542.) They
22 heard about a contemporary newspaper article describing the crime and circumstances surrounding
23 the crime. (4 RT 557-62, 566-7.)

24 If jurors credited the informant, they did so because of evidence extrinsic to his
25 motivations and character for honesty. For example, they heard evidence confirming the informant
26 was in fact appellant's cell mate. (5 RT 622.) And they found out the informant reported statements
27 from Petitioner about matters which had not yet been reported in the media (4 RT 569-70, 5 RT 637-
28 8), including alleged threats the victim most likely made to Petitioner while phoning the gas station

1  where Petitioner worked (4 RT 532-3, 5 RT 628); and the discovery of a .357 magnum handgun and
2  gloves during the search of Petitioner's residence (5 RT 627-8).
3      The state courts could also consider the credibility of the allegedly newly-discovered
4  evidence when deciding whether it would render a different outcome reasonably probable on retrial.
5  *People* v. *Farmer,* 47 Cal. 3d 888, 917, 254 Cal. Rptr. 508, 765 P.2d 940 (1989); *People* v. *Cole,*
6  94 Cal. App. 3d 854, 859, 155 Cal. Rptr. 892 (1979); *In re Wright,* 78 Cal. App. 3d 788, 802, 144
7  Cal. Rptr. 535 (1978); *People* v. *Beryea*, 38 Cal. App. 3d 176, 202, 113 Cal. Rptr. 254 (1974). (*See*
8  *also* (2 CT 261 (the state prosecutor's points and authorities opposing the new trial motion).) One
9  would not normally expect a jail inmate to endanger his life by making statements to fellow inmates
10 which suggested he was a "snitch." Petitioner could not prove the two jail inmates who provided
11 declarations alleging Petitioner told them he concocted a story in order to help his own case would
12 have provided testimony any more credible than that of the informant. And testimony from the
13 deputy sheriff/declarant who opined Petitioner displayed custody concerns prompting inter-jail
14 transfers would have added little of substance to the impeachment evidence already before the jury.
15     Because Petitioner could not prove his federal habeas corpus claim that the state prosecutor
16 violated due process by intentionally or inadvertently suppressing material evidence, i.e., evidence
17 which would have rendered a different verdict reasonably probable, the state courts reasonably
18 rejected Petitioner's second (and last) federal habeas corpus claim.
19 ///
20 ///
21 ///
22 ///
23 ///
24 ///
25 ///
26 ///
27 ///
28

# CONCLUSION

Accordingly, for the reasons stated, Respondent respectfully asks that the petition for writ of habeas corpus be denied.

Dated: August 11, 2008

Respectfully submitted,

EDMUND G. BROWN JR.
Attorney General of the State of California
DANE R. GILLETTE
Chief Assistant Attorney General
GARY W. SCHONS
KEVIN VIENNA
Supervising Deputy Attorney General

s/Garrett Beaumont

GARRETT BEAUMONT
Deputy Attorney General

Attorneys for Respondent

GB:adc
80270309.wpd

# DECLARATION OF SERVICE BY U.S. MAIL

Case Name:   **Crowder v. Tilton**

No.:   **08-0694 DMS (JMA)**

I declare:

I am employed in the Office of the Attorney General, which is the office of a member of the California State Bar, at which member's direction this service is made. I am 18 years of age or older and not a party to this matter. I am familiar with the business practice at the Office of the Attorney General for collection and processing of correspondence for mailing with the United States Postal Service. In accordance with that practice, correspondence placed in the internal mail collection system at the Office of the Attorney General is deposited with the United States Postal Service that same day in the ordinary course of business.

On August 11, 2008, I served the attached **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF RESPONDENT'S ANSWER TO PETITION FOR WRIT OF HABEAS CORPUS** by placing a true copy thereof enclosed in a sealed envelope with postage thereon fully prepaid, in the internal mail collection system at the Office of the Attorney General at 110 West A Street, Suite 1100, P.O. Box 85266, San Diego, CA 92186-5266, addressed as follows:

John Lanahan
Attorney at Law
Law Offices of John Lanahan
550 West C Street, Suite 1670
San Diego, CA  92101-8557
lawnahan@sbcglobal.net
(Attorney for Petitioner)

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed on August 11, 2008, at San Diego, California.

|           A. Curiel            |         [signature]         |
| :----------------------------: | :-------------------------: |
|           Declarant            |          Signature          |

80270621.wpd